WILLIAM S. SAMPLE *et ux.*, Appellees, v. W. B COLLINS, Executor, Appellant.

1. **Specific Performance:** DECREE: SATISFACTION: APPEAL. The decree rendered herein provided for the transfer of certain real and personal property by the defendant to the plaintiff. Upon the suggestion of the court, the defendant surrendered possession of the property in question, pending proceedings on appeal, to the plaintiff, for the purpose of reducing the amount of the *supersedeas* bond. *Held,* that there was not such a performance of the decree as to prevent an appeal.

2. ———: EVIDENCE. The plaintiffs, who are husband and wife, brought this action against the executor of the will of the husband's stepmother to secure the performance of an alleged parol agreement, made by the stepmother, during her lifetime, to convey to them certain real and personal property in consideration of

care and attention to be given to her person and estate. The evidence showed that such care and attention was given the deceased until her death, but it amounted to little more than what might reasonably be expected from plaintiffs in view of the relationship of the parties. The value of the property in question was above ten thousands of dollars, and there was no evidence of any express agreement for its conveyance. The deceased, however, had been infirm for several years prior to her death, during a part of the time being incapable of taking care of herself, and a number of times gave expression of her gratitude to plaintiffs for remaining with and caring for her, and of her intention to leave said property to them for a home upon her decease. *Held*, that the evidence failed to show an agreement to convey. [ Beck, J., *dissenting*.]

*Appeal from Lee District Court.*—Hon. J. M. Casey, Judge.

Friday, October 10, 1890.

Action in equity to enforce an alleged verbal agreement to convey certain real estate, together with the furniture, etc., situated upon the same. The plaintiffs allege that, about ten years before her death, it was verbally agreed between them and Sarah M. Sample, deceased, that if plaintiff, William S. Sample, would remain in Keokuk with his family, and be near Sarah M. Sample when she needed any assistance, and would render her assistance in attending to her affairs, and nursing and caring for her when she was sick, she would provide for said William S. and Julia H. Sample upon her death; that Hugh W. Sample, the father of plaintiff William, and husband of Sarah M., departed this life March 31, 1869, leaving a last will, which was duly probated, whereby he gave to said Sarah M., his widow, a life-estate in the homestead, with remainder to William S. and S. S. Sample; that plaintiffs, without the payment of any consideration therefor, made a conveyance of said homestead to Sarah M. to enable her to have a fee-simple title, and to dispose of the same; that she thereafter sold said homestead for eleven thousand and five hundred dollars, and used part of the proceeds in purchasing the property in

question; that on the settlement of Hugh W. Sample's estate, when it was apparent that plaintiffs would receive nothing, Sarah M. Sample verbally promised and agreed with plaintiffs, in consideration of the conveyance to her of said homestead, and of the care, attention and assistance rendered, and to be rendered by nursing and caring for her while sick, and in attending to the purchase of property for her, and investment of money, she would convey the property in controversy, to-wit, lots 11 and 12, block 40, Keokuk, Iowa, with the furniture therein, to them, subject to a life-estate in herself; that, in pursuance of said agreement, they performed services in nursing, caring for and looking after the business of said Sarah M. Sample, and fully performed the agreement on their part; that no conveyance was ever delivered to them. Wherefore they pray an order of court conveying to them said lots 11 and 12, block 40, Keokuk, Iowa, with the furniture therein. The defendant answered admitting that Sarah M. Sample sold the homestead for eleven thousand, five hundred dollars; that she purchased the lots in question with a part of the proceeds, and used the same as her homestead to the time of her death, and that H. W. Sample was her husband; denies every other allegation of the petition; and alleges that the agreement set out is void because not in writing, and is barred by the statute of limitation. The defendant, by way of counterclaim, asks to recover three thousand dollars, paid by plaintiff on checks, and for twenty-five thousand, six hundred and fifty dollars, with interest, at ten per cent., as due on a contract of W. S. Sample to pay S. M. Sample ten thousand dollars of the stock of the National Bank of Keokuk, dated February 22, 1872. Plaintiff replied, denying the counterclaim, and alleging that the checks were drawn by S. M. Sample to get money out of the bank for her own use, which plaintiff drew and handed to her; that the check for two thousand dollars, July 20, 1887, was drawn to pay for lots 1, 2 and 3, block 102, purchased by her; that the check, November 9, 1882, for three hundred dollars,

was a gift to plaintiff ; that the amount claimed on the bond is barred by the statute of limitation ; that by the will of Sarah M. Sample the makers of said bonds were released. The court ordered the case transferred to the equity side of the docket, and tried as an equity case upon the specific performance of the contract alleged in the petition. The case was tried to the court, and a decree entered in favor of the plaintiff. The defendant appeals.

*W. B. Collins*, for appellant.

*J. H. Anderson*, for appellees.

GIVEN, J.—I. The appellees move to dismiss the appeal on the ground that the decree of the court was fully performed by appellant. It appears, by affidavits filed, that after the decision of the court had been announced, and the amount of the *supersedeas* bond was being considered, the judge suggested that, if the possession of the property was delivered over to plaintiffs' attorney, the amount would be five hundred dollars ; whereupon the amount of the bond was fixed at five hundred dollars, and the plaintiffs were given possession of the property, but no conveyance was made. This was not such a performance of the decree as to prevent an appeal. It was simply a compromise by which to lessen the amount of the *supersedeas* bond necessary to indemnify the plaintiffs. The real estate which is the most important feature of the contention is still subject to the final decree that may be entered. The motion to dismiss the appeal is overruled.

1. SPECIFIC performance: decree: satisfaction: appeal.

II. We first inquire whether there was an agreement as alleged. There is no evidence of any negotiations or conversations between the plaintiffs and Mrs. Sample as to such an agreement, and nothing to show that such an agreement was made, except as it may be inferred from the relations and acts of the parties, and declarations of Mrs. Sample. Mrs.

2. ——: evidence.

Sample was stepmother of the plaintiff William, and until her death was upon intimate and friendly terms with him and his wife, Julia H. Sample. Mrs. Sample, deceased, was infirm for several years prior to her death, and for part of the time incapable of taking care of herself. The only evidence directly tending to show the care and attention given to her by the plaintiffs is that of Mrs. Diver, who testifies that they were there a good deal. "I saw them doing more than I was. She was their stepmother. I do not know that I saw them doing anything. She had a servant. They were there ready to do, and so was I." Also that of Mrs. Chittenden, who says that they cared for her to the last, about five years. They were there often. Mrs. Chittenden also testifies that Mrs. Sample spoke about the care and attention that William and his wife had given her, and of her dependence upon them for such care. She said that William had talked of going away, and that she felt that he had staid here on her account as much as anything else; that he had been everything to her, and done everything for her that it was possible for him to do. That at one time she offered to stay and assist her, and she said, "William and Julia will stay." About all the testimony as to William's attention to her business is that Mrs. Sample was in the habit of calling him to take her checks to the bank and get money for her. We do not understand from the testimony that he acted for her in any of the real-estate transactions mentioned. The agreement set out surely called for more attention to Mrs. Sample, and to her business, than is ordinarily given gratuitously by friends and relatives, and yet it is not shown that these plaintiffs rendered the deceased any more care, attention or service than might have been expected from them, in view of their relations. During all these years Mrs. Sample was attended by one and part of the time two servants, both of whom have testified, and could have stated as to plaintiffs' care and attention to deceased beyond that which appears, if such care and attention had been given. Surely the care and attention shown to have been

given not only fails to warrant an inference of agreement as alleged, but to show that such an agreement was performed.

The plaintiffs alleged, as part of the consideration for the promise to convey to them the lots in question, the conveyance by them of their interest in the homestead of H. W. Sample, deceased, without consideration. There is not only an entire absence of testimony to show such an agreement, but the written contract, in pursuance of which the homestead was conveyed, shows that it was upon consideration "of the just rights of dower of the said Sarah M. Sample in the estate of H. W. Sample, and that she does not oppose the probating of said will as written." It appears in testimony that on many occasions, when speaking about the plaintiffs and the property in question, Mrs. Sample, deceased, said that she intended it as a home for the plaintiffs when she was gone. Mr. Collier testifies: "Mrs. Sample told me that she had bought that property; that she felt that if she did not buy a home for Will he would not have one. * * * She wanted a place for a home for William. He had been good to her. She wanted to buy it for a home for him." H. W. Sample, son of plaintiffs, testified that one day his father was talking to his grandmother about building a house, and "she said: 'Never mind about that. Don't worry about that.' She did not expect to occupy the place long, and father should have it after she was through with it." To Mrs. Malcolm she said she wanted to buy the house so she could leave it to her son William for a home, that it was for a home for herself while she should live. Louise Hampton testifies that deceased said she thought she would get a home, and leave it to Mr. Sample's folks when she was through with it. Mrs. Hale testifies that Mrs. Sample frequently informed her of her intention to purchase a house for her own use during her life, and to leave it at her death to William, and gave as a reason that otherwise he would not have one; that her object in buying the house was to provide a home for William and his family after her death.

It will be observed that in these repeated statements of Mrs. Sample no mention is made of any agreement. She speaks of leaving the property so that it would go to plaintiffs at her death, because they had been kind to her, and would not otherwise have a home, but not because of any agreement. The plaintiffs ask specific performance of the parol contract, the existence of which is denied. We think the testimony fails to show that an agreement was made as alleged, and hence that the plaintiffs are not entitled to relief demanded.

III. We think defendant's counterclaim is sufficiently answered in the testimony, and certainly conclusively answered by the clause in Mrs. Sample's will, wherein she directs her executor to give to Samuel and W. S. Sample "acquittances and releases and receipts in full of all indebtedness and obligations to me, whether due or to become due, and the same shall be released and canceled."

Our conclusion is that the decree of the district court be reversed, and decree be entered dismissing the plaintiffs' petition, and with judgment that plaintiffs pay the costs. REVERSED.

BECK, J. (*dissenting*)—I. I cannot concur in the foregoing opinion of the majority of the court. I am clear in my conviction that the judgment of the district court ought to be affirmed. The evidence, in my opinion, clearly establishes facts authorizing the legal inference of an agreement between defendant's intestate and plaintiffs to the effect that she would secure to plaintiffs, by conveyance or by other assurance, the homestead occupied by her, to be possessed and enjoyed by plaintiffs after her death. The consideration of this contract moving from plaintiffs was their undertaking not to remove from Keokuk, and to give intestate such care and service as her condition of health and advancing age required, and to devote to her business such attention as it demanded. The evidence clearly shows that plaintiffs did perform these undertakings, and that intestate received the full measure of the consideration

of the contract. It is true that there is no evidence showing negotiations between the parties, a formal proposition made on one side and accepted by the other. No witnesses detail the conversation of the parties made in negotiations leading to the contract. There is no writing witnessing, and no formal calling of witnesses to hear, remember and testify to an oral agreement between the parties. Such proceedings and methods of attestation and proof of contracts are often, perhaps usually, had when strangers, or those having no close relations, deal with one another. But they are unusual, perhaps, never had, when parent and child, having the fullest confidence and warmest affection for each other, have dealings of this kind with each other. The dutiful, tender and affectionate son would be shocked by a proposal to call a notary to attest, and witnesses to hear and remember, an agreement between him and his loving mother. The mother, ignorant of the forms and proceedings of business (one witness testifies that no one could be more so than intestate), would be equally shocked that one would doubt her intentions, and that she would fulfill her agreement. For these reasons, no doubt, .the agreement between the parties was not evidenced by writing, and no witnesses were called to hear it. The lips of the plaintiffs are closed by the law.

This court holds that there is no evidence supporting the contract. In my opinion there is the clearest evidence, which is sufficient to convince the judicial mind to the degree of the most complete satisfaction that the agreement alleged in the petition was entered into between the parties, and fully performed by plaintiffs. That evidence is the clear, distinct and often-repeated statements and admissions of intestate. She, over and over again, declares her intention that the plaintiffs shall have the homestead she occupied, that they had remained in Keokuk to enable them to devote care and attention to her, and that they had served her, etc., etc., showing distinct admissions of obligation to secure the property to plaintiffs in consideration of

these services.  Surely, upon this evidence, the law will infer what every reasonable man would believe, namely, that there was an arrangement between the parties to the effect that intestate should secure to them the homestead in consideration of these services to her.

II.  The opinion plainly says that the evidence shows but limited attention and services of plaintiff to intestate which, inferentially, as I understand the opinion, is not sufficient to support a promise by intestate.  Yet the opinion quotes evidence reciting the declarations of the intestate to the effect that she was dependent upon plaintiffs for care and attention, which they gave her; that Mr. Sample, on her account, remained in Keokuk; and "that he had been everything to her, and done everything for her that was possible for him to do."  And yet the opinion puts depreciatory estimates upon plaintiffs' services and care of deceased.  In my opinion, the evidence showing her declarations is the fullest possible proof. of the great extent of plaintiff's services.  She declares that they remained in Keokuk on her account, to render services to her, and, having remained, William, the plaintiff, "had been everything to her, and done everything for her that it was possible for him to do."  Surely none knew better than she herself what services plaintiff had rendered to her.  It surely was not the legal, moral or filial duty of plaintiffs to forbear to change their home, and to remove to another state or city in order to better their condition, and to remain in Keokuk presumptively to their financial disadvantage.  There is clear evidence of services rendered by plaintiffs which constitute the consideration of the contract between the parties.  The evidence shows that the relations between the decedent and Mr. Sample, plaintiff, were of the most tender and affectionate character.  While she was a stepmother, neither could have been more affectionate and confiding as to the other had she been his natural mother.  Doubtless she assumed the relation of stepmother when he was of such tender years that he

acquired for her all the affection of a son, and she for him all the affection of a mother.

III.   Let it be supposed that the case presents these facts:   Mr. Sample, through a course of years, supplied his stepmother, at her request, with money, amounting in the aggregate to many thousands of dollars, which was used by her to secure services and other things necessary for her comfort.   These large advances were often acknowledged by her; accompanied by expressions of gratitude therefor, with frequent declarations that in return for them, and in discharge of the obligation imposed upon her for these advances, she intended to secure to him the homestead occupied by her.   Such expressions were made to him, and to his family, and often to others.   Under such a state of facts, can any one doubt that the law would infer a contract binding her to secure to him the homestead in the absence of equities therein held by others?   Indeed, the consideration for the contract having been shown beyond question, and the frequent admission of the obligation arising from the receipt thereof being established by clear proof, the law will infer a contract entered into between the parties binding the intestate to secure to plaintiff the homestead.   See *Wence v. Wykoff*, 52 Iowa, 644; *Van Sandt v. Cramer, Adm'r*, 60 Iowa, 424. We think no one would contend, where the consideration of the alleged contract was money paid, instead of services rendered, that the law would not infer a contract between the parties.   But in this case plaintiffs, instead of advancing to intestate a few thousands of dollars, gave her care, attention and services for years, which, under the law, they were not bound to render, and which these relations did not impose upon them as a filial, moral or honorable obligation.   These services and care were more valuable to intestate than money.   They required greater sacrifice on the part of plaintiffs than the payment of thousands; for the performance of these services kept plaintiffs and their family in Keokuk, depriving them all of opportunities of seeking employment and fortune elsewhere, which is usually attained

by the intelligent and faithful. We are authorized to infer that plaintiffs are persons of that character. Surely the law will imply a contract under the facts of the case as readily as though it were shown that plaintiffs advanced to intestate money upon her request.

IV. In my opinion there can arise no reasonable doubt that deceased intended that plaintiffs should have the property. Such an intention is established by the plainest evidence. The law, on the facts and principles heretofore stated, will infer that there was an agreement between the parties, and the intention was pursuant thereto. But under the principles of equity which require courts to effectuate intentions, the law, in order to do so, will infer the existence of a contract when there are no conflicting equities. This will be done in the exercise of the power of equity to enforce rights based upon unexecuted intentions. If such intentions be purely voluntary, chancery can give no aid to compel the enforcement of such rights. But the existence of the intention being clearly shown, equity will, with acute and vigilant intelligence, seek for grounds on which the intention may be effectuated. It will find, in this case, evidence establishing inferentially the existence of an agreement. Justice demands that the contract be enforced, and thereby the intentions of intestate be effectuated. The duty of courts in such cases is forcibly expressed by Lord HOLT in *Fisher v. Wiggins*, 12 Mod. 297. In support of the doctrine he announces, he cites a rule announced seventy years before by Sir HENRY HOBART, chief justice of the court of common pleas, in *Earl of Clanrickard's Case*, Hob. 273. Lord HOLT uses this language: "Judges ought to be curious and astute to find a means to support the intent of parties, which often makes judges in constructions transpose clauses in deeds, and split an instant into priority and posteriority, and never adjudge without reluctancy against intent of parties, especially in intended provisions for children." Sir HENRY HOBART, in the case cited by Lord HOLT, makes this declaration: "I do

exceedingly commend the judges that are curious and almost subtile, astute (which is the word used in the proverbs of Solomon in a good sense, when it is to a good end) to invent reasons and means to make acts according to the just intent of the parties, and to avoid wrong and injury, which by rigid rules might be wrought out of the act." It will be observed that the rule of these cases is intended to effectuate the intentions of parties, and thereby attain justice and defeat wrong and injury in the administration of the law : ends and purposes for which this court has its existence, and which I am sure it is always the pleasure of my brothers to endeavor to attain. The rule cannot be commended in language too strong. The attainment of justice and the prevention of wrong and injury is the aim and end of all adjudications of this court, and whatever stands in the way thereof must be brushed aside or overthrown, though it be forms and technicalities recognized by the law as controlling the practice in judicial proceedings. The obstacle in the way of recovery by plaintiffs in this case, as held by the majority of this court, is that they fail by direct evidence to establish clearly, as required by the technical rules of the law applicable to such cases, a contract formally entered into between them and the defendant's intestate, Mrs. Sample. This rule exists to effectuate justice, and defeat attempts to perpetrate wrong. It is intended to protect estates from fraudulent claims, based upon alleged contracts made upon supposititious considerations, in cases wherein neither contract nor consideration is established, and nothing appears to support the good faith and justice of the claims. It is not intended to defeat a claim when the consideration upon which it is based is shown beyond dispute, and where justice and right demand that it be enforced. Technical rules of this character, with forms of proceedings, constitute the vessel in which the cargo of justice is borne. If one or the other is to be lost, it must be the vessel. The precious cargo must be saved, though the hull that bears it must be abandoned in order to secure its preservation. These

doctrines lie at the very foundation of our system of jurisprudence and are as old as the common law. Lord HOLT's language, quoted from *Fisher v. Wiggins*, was used in 1693, and the decision of Sir HENRY HOBART in *Earl of Clanrickard's Case* was made in 1626. I am not informed that any court of England or the United States has ever doubted the doctrine of these cases. Surely it is not for the supreme court of Iowa, which is and ought to be at the head of all advances towards the correct administration of justice, to ignore the doctrines and rules intended to attain that end, which, in the cases we have cited, were first announced two hundred and sixty-four years ago. This court should rather uphold, extend and broaden the doctrines, if it be required in the perfect attainment of justice. But the foregoing opinion of the majority of this court, in my judgment, by failure to give force and effect to authorized legal inferences drawn from established facts, without any attempt "to be curious and astute to find means to support the intent of parties," defeats such intent. The contemplation of the effects of the decision of a majority of this court in the case is to me extremely painful. The deceased was possessed of considerable property which she acquired from the estate of Mr. Sample's father. The justice and generosity of himself and his brother, the only heirs, secured it to her without contest or dispute. He, it is inferable from the record, received little, if anything, from his father's estate. He is now a poor man, not owning a homestead. Through the decision of this court, the homestead, which his kind and loving stepmother intended to secure to him, is, by the defeat of her intentions, diverted to her distant relatives; for she had no children of her own, and the son of her husband from whom she obtained her property cannot obtain, under the decision of this court, the homestead she intended for him. I am forced to say that, as the law never intends such injustice, it ought not to be done by the decision of this court of equity. This court should, in the language of Lord HOLT, "be curious and astute to find a means

to support the intent" of the deceased in this case, and defeat the great injustice resulting from the decision of the majority announced in the foregoing opinion. In my judgment the judgment of the district court ought to be affirmed.